**SIGNED.**



**Dated: November 24, 2010**

_____

**JAMES M. MARLAR**
**Chief Bankruptcy Judge**

_____

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

In re:

LINDA VISTA CINEMAS, L.L.C.,

Debtor.

) Chapter 11 Proceedings
)
) No. 4:10-bk-14551-JMM
)
)

## MEMORANDUM DECISION:
## PLAN CONFIRMATION

1    Presented to the court over two days, October 27, and November 2, 2010, was the plan

2    of reorganization proposed by the Debtor (ECF Nos. 52 and 65) (the "Plan").

3    Evidence was taken in the form of numerous documents and witnesses, and the parties

4    have filed written memoranda on legal points, and further addressed their positions through

5    argument during the hearings.

6    The court has considered all sides of the issues, has carefully reviewed the pertinent

7    record and law in this case, and now rules.

8

9                               **I.  THE PLAN**

10

11    The Debtor originally filed a plan on August 24, 2010 (ECF No. 52), and amended

12    it on September 14, 2010 (ECF No. 65).  In concept, the Debtor's Plan proposes to repay all of its

13    creditors 100% of their outstanding indebtedness, over a period of time.[1]  Contributions to the

14    Debtor will be made, as needed, by the principals and affiliates of the Debtor.  These same parties

15    have also guaranteed the obligations of the Debtor to its primary secured creditor, Bank of Arizona,

16    N.A. (the Bank").

17    The breakdown of the Plan's treatment of its creditors, as well as the vote of each class

18    (ECF No. 84, Ballot Report), is:

19

20

21

22

23

24

25

26

27

28    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
      [1]    The only exception is the "administrative convenience" Class 8, which opted for an
      immediate payment of small amounts.

2

Main Document    Page 2 of 43

| Class | Type | Treatment | Amount | Impaired | Vote |
|-------|------|-----------|--------|----------|------|
| 1 | Administrative | Any unpaid operating expenses, attorneys and accountants fees, and U.S. Trustee fee will be paid at confirmation (effective date) | Unknown | No | n/a |
| 2 | Secured Claim of Pima County | Paid at $250 per month, all paid at 4th anniversary of Plan confirmation; interest at statutory rate | $8,773 | Yes | Accept |
| 3 | Bank of Arizona | • Interest to accrue at 1.5% above floating prime rate (3.25% today), or 4.75%<br>• Interest only payments, months 1-24<br>• Payments, months 25-84; debt amortized over 20 years at 4.75%; payments of principal and interest, monthly<br>• 7th anniversary of confirmation, debt paid off in full (approx. $2,602.051)[2]<br>• State court actions (including noticed trustee's sales) will be stayed against all guarantors and their assets so long as Debtor performs under the Plan | 3,131.977 | Yes | Reject |
| 4 | Secured Claim of Marana Cinemas (Landlord) | Interest accrual at prime or as agreed; interest only payments for 7 years, then repaid in full | $120,000 | Yes | Accept |
| 5 | Unsecured Priority (IRS and ADOR) | Paid in full; interest accrual at 5%; monthly payments of $234.70 for 4 years | $10,058 ADOR $350 IRS | Yes | Accept |
| 6 | General Unsecured | 10% at confirmation; interest at 1 year; LIBOR rate; 10% per year or pro rata share of 50% of net cash flow; paid in full at 4th anniversary of confirmation | 17,694 | Yes | Accept |
| 7 | Unsecured Claim of Marana Cinemas (Landlord) | Deferred rent; first 5 years; no payment, but interest to accrue at prime rate; then amortize claim over 20-year period, with full payoff at end of year 7 | 257,000 | Yes | Accept |
| 8 | Convenience Class | Claims above $500 reduced to 50% or capped at $500; claims less than $500 paid 50%; all paid on effective date | 1,373 | Yes | Accept |
| 9 | Equity Security Holders | Retain interests; no distribution until senior classes paid pursuant to Plan | n/a | Yes | Accept |

---

[2] Depending upon final resolution of the Bank's debt, this figure could be higher, at $3.1 million or so (Ex. A).

Case 4:10-bk-14551-EWH   Doc 95   Filed 11/24/10   Entered 11/24/10 15:47:02   Desc
Main Document    Page 3 of 43

After the court approved the Debtor's Disclosure Statement (ECF No. 71), both it and the Plan were circulated to the various classes of creditors. The creditors voted, and the Debtor filed a tally with the court as to the results of the voting by each class. (Ballot Report, ECF No. 84).

Only the Class 3 secured creditor, the Bank, has rejected the Plan and its modifications, and has objected thereto (ECF Nos. 81 and 82).

## A. The Debtor

The Debtor owns and operates a movie multi-plex known as Tower Theatres. Like many businesses which began operations in the mid-decade, this start-up operation was adversely affected by the economic turndown affecting Tucson and the state. The theater, which leases its site in a relatively new and developing retail area, had worked with its landlord in a "build to suit" stand-alone movie theater pad. It financed the equipment and improvements through both capital infusions by its principals and their affiliates, and by a $5,2983,000 loan from the Bank (Ex. 9).

## B. The Bank of Arizona Loan

The $5.3 million borrowing, made on October 27, 2006, was to mature on August 1, 2014 (Ex. 9). The loan had several pieces of collateral securing it, including liens on:

- The Debtor's leasehold interest;
- Equipment and other personalty related to the business;
- A Deed of Trust upon the real property owned by Cutler Fire Protection, Inc.
- A Deed of Trust on the home of Daniel and Linda Cutler; and
- A Deed of Trust on the home of Kent and Angela Edwards.
- Equipment lien on the personal property assets of Grand Cinemas, LLC.

(Ex. 8, 14; Debtor's Memorandum dated October 25, 2010 (ECF No. 85).

4

In addition, the Bank holds continuing guarantees, for the obligations of the Debtor, from:

- Cutler Fire Protection, Inc.;

- Grand Cinemas, LLC;

- Daniel G. and Linda L. Cutler;

- The Daniel G. and Linda L. Cutler Revocable Living Trust; and

- Kent and Angela Edwards.

## C. **The Bank of Arizona's Status in This Case**

Throughout the duration of this bankruptcy case, the parties have all dealt with the Bank as a fully secured creditor. No issue has been raised, by either side, that the Bank was either partially or fully unsecured.

The Debtor's Plan treats the Bank as fully secured (Class 3), and the Bank rejected the Plan, as a creditor holding a secured claim, on October 19, 2010 (Ex. 2, Bank of Arizona's Statement, p. 1 at line 22; p. 2 at lines 1-2) (ECF No. 82).

There was no argument, or evidence presented, suggesting that the Bank held any claim other than one which was fully secured.[3] Thus, for purposes of this discussion, the Bank is deemed to be a fully secured creditor.

## D. **The Evidence**

The Debtor presented its case through the testimony of four witnesses and several documents. The Bank presented one witness and three exhibits in rebuttal. In summary, the evidence was as follows:

---

[3] The court inquired, at the confirmation hearing, as to the Bank's status, and was advised that the Bank felt itself totally secured.

## 1. **Kent Edwards**

Kent Edwards testified that the ownership structure of the Debtor LLC was that he and his wife owned an 8% share, while the Cutlers owned 92% of the enterprise. The concept for a multi-plex theater in the northwest part of Tucson was conceived mid-decade, and the construction concluded and the theater opened in about December, 2007.

The startup financing was a $1.4 million infusion from the principals, and a $5.3 million borrowing from the Bank.

Over the next few years, as the economy and "rooftop" building in the surrounding areas worsened, the Debtor had increasing difficulty in meeting its debt service requirements to both its landlord and to the Bank. However, through the principals' sales of other property, the proceeds from which were committed to the Bank, the Debtor's loan was reduced by $2 million to its present figure of about $3.1 million. (*See*, e.g., Ex. 13.)

Since the filing of the case, the Debtor has paid the Bank $10,000 per month as "adequate protection" payments.

Mr. Edwards has had significant experience in the operations and management of retail movie houses. He testified that completion of significant road projects leading to the theaters will enhance customer attraction to the theaters from surrounding neighborhoods.

He also testified that his other two theater ventures, Crossroads and Grand View, are profitable and well-managed. These two entities are held by Grand Cinemas, LLC, itself a guarantor of the Bank's debt. That entity employs approximately 50 people. The past and projected profitability of Grand Cinemas was reflected by Ex. 5, with a $95,000 net profit expected and on track for 2010.

Mr. Edwards also noted that, if necessary, Grand Cinemas could grant a deed of trust to the Bank on a parcel of land which it owns on Valencia Road, worth about $25,000.

Toward the reorganization, Mr. Edwards stated that the Debtor's landlord, Marana Cinemas Associates, LLC, had made significant voluntary concessions and deferments to support the Debtor's Plan.

6

1    Mr. Edwards noted that the Debtor did better in 2009 than it had in 2008; held a 7.5%
2  Tucson market share, up from 6% in 2008; and he expected a competitor to close in early 2011.

3    As for the feasibility aspects, Mr. Edwards observed that if the Debtor is able to
4  complete its performance under the Plan, that it should be able to refinance out the Bank in seven
5  years. This is true, in part, because the initial Bank loan of $5.3 million will have been reduced by
6  half, and by seven years hence, Arizona's economy and the growth in the neighboring areas should
7  have resumed once more. In that regard, the Debtor's projections reflect losses, over the next three
8  years, as follows:

| 2011 | (134,118) |
|------|-----------|
| 2012 | (75,652)  |
| 2013 | (835)     |

13    Thereafter, the Debtor projects positive revenues until the Plan's term ends. (*See* Ex.
14  B to Ex. 1.) As for losses incurred to date, and which will need to be covered in the next three years,
15  Mr. Edwards stated that, as they had done in the past, the guarantors of the Bank debt would support
16  the Debtor through application of their own cash infusions as needed. As for the Debtor's
17  performance in 2010, Mr. Edwards felt that the actual performance had matched the projections.

## 2. **George C. Larson**

21    Mr. Larson has been a real estate investor and property manager, principally in
22  Tucson, since 1970. He owns and/or manages about 40 properties in Tucson. Over the years, he
23  has leased property to Grand Cinemas, and in doing so, dealt personally with the Cutlers and the
24  Edwards. He found them to be excellent tenants, good businessmen and parties that never missed
25  a payment. However, as for the Debtor, the parties have had to work together, in difficult economic
26  times, to cobble together modifications to their existing leasehold/landlord/tenant relationship.

27    Critical to the Debtor's feasibility is its ability to comply with its Plan, and make the
28  payments called for therein.

7

Mr. Larson, in about 2006, agreed to build a $12 million theater building which he could then lease to the Debtor. For that purpose, he acquired 12 acres and began construction in 2007. As affected many in this time period, the project then ran headlong into an economic meltdown, rising construction costs and interest rates, and a new housing slump. Added to that mix was a perceived "lack of synergy" for the commercial development into which the theater was placed. To offset these events, lease concessions were given to the Debtor. Now, the Debtor pays its landlord $87,185 per month, down from $102,570 per month. From his side, Mr. Larson must service an $8.6 million obligation to Wells Fargo,[4] which debt is secured by the land and building. Mr. Larson's entity also financed some movie projectors, and holds a $120,000 lien against that personalty (Ex. 15).

Mr. Larson, too, opined on the Plan's feasibility, noting that it was "not likely" that a competing movie theater would be built in the next 5-7 years, nor that Tucson would "stay in a recession for seven more years," and that the Debtor's ability to refinance half of its original Bank loan in seven years would not present difficulties.

### 3. Randall P. Sanders

Mr. Sanders was called by the Debtor as its expert on market rates, and was so qualified. His credentials, as well as his report, were placed in evidence as Ex. 7.

Mr. Sanders explained the methodology by which he felt that a reasonable market rate of interest for the forced term of the "cramdown" proposal for the Bank, accounting for risk and the nature of the security, left the parties with a reasonable market rate of 4.13%. The Plan proposes 4.75%. Mr. Sanders also gave reasons which, approaching the interest rate from another direction, left him with a rate of 5.5%.

Ultimately, his view was that 4.75% "falls within the range of proper rates in light of the facts at hand." (Ex. 7.)

---

[4] Mr. Larson pays $62,000 per month to Wells Fargo.

Case 4:10-bk-14551-EWH   Doc 95   Filed 11/24/10   Entered 11/24/10 15:47:02   Desc
Main Document      Page 8 of 43

1    In discussion with counsel, Mr. Sanders noted that the strength, quality and character

2    of the guarantors was the primary motivating force for the Bank loan, because the Debtor's

3    personalty, standing alone, did not justify a $5.3 million loan. That primary guarantor, Cutler Fire

4    Protection, and to a lesser extent, Grand Cinemas, are profitable and add strength to the Bank loan.

5            Although the Plan stretches the term of the Bank's loan out four years longer than

6    originally contemplated, the interest rate is fair enough to ensure a reasonable return on investment;

7    and the financial strength of the combined guarantors ensures a continued commitment to the

8    Debtor's enterprise. And, the Plan does not release either the guarantors nor their pledged collateral.

9    Thus, as the loan reduces, the loan to value ratio, as to the collateral, increases proportionately.

10

11                                **4.  Daniel G. Cutler**

12

13           Mr. Cutler and his wife are 92% interest holders in the Debtor. Their principal

14   business is as the owners and managers of Cutler Fire Protection, Inc. ("CFP"). CFP's net profit has

15   ranged, in recent years, from 17-22% (Ex. 4). As guarantors of the Debtor's obligations to the Bank,

16   and principals of the Debtor, CFP and the Cutlers have made substantial capital infusions into the

17   Debtor to keep it operational (Ex. 4).

18           CFP is a profitable entity, and is the state's second-ranking fire protection construction

19   business. Even in these difficult economic times, CFP has been profitable. Even today, the CFP

20   business also has a $1 million backlog in work. This is a positive development from the recent past.

21           To date, the Cutlers or CFP have infused about $4.2 million into the Debtor, for

22   construction-related costs, payments to the landlord, or in assisting with debt service to the Bank.

23           Mr. Cutler explained that, with regard to the Plan's provision that stayed the pending

24   actions (judicial and non-judicial) against the guarantors and their assets, that the most critical

25   impact would be on CFP if the stay were not extended. To protect its property, CFP would have to

26   file its own Chapter 11, which filing would adversely impact its bonding relations, and thus its

27   ability to obtain new contracts or continuing with existing ones.

28

1    In addition, the Cutlers, as well as CFP, the Edwards and Grand Cinemas, would also

2    be forced to file Chapter 11 to protect their assets, all to allow the present Debtor to implement its

3    Plan.  Thus, instead of one Chapter11, there would be five.  All plans would dovetail with the

4    Debtor's Plan, essentially marshaling assets for the benefit of the Bank, but liquidating (or not)

5    assets in an orderly fashion to eventually pay off the Bank.

6        However, if the Plan is confirmed, the unnecessary Chapter 11's would not need to be

7    filed, which would enable the guarantors--principally CFP and Grand Cinemas--to continue to be

8    profitable and devote much of that profit toward this Debtor's Plan payments and ultimate successful

9    reorganization.

10

11                            **5.  Paul D. Mesmer**

12

13        The Bank called, as its sole witness, Paul D. Mesmer, a senior vice-president of the

14    Bank.  Mr. Mesmer testified that the loan balance was in the range of $3.6 million (Ex. A).  Mr.

15    Mesmer felt that too much risk was placed on the Bank, both in requiring it to wait longer for

16    repayment, and in the Plan's provisions which seek to stay continuation of pending judicial and non-

17    judicial actions against the guarantors and their property (cross-collateralized to secure the Debtor's

18    loan).

19        Although Mr. Mesmer complained that the Debtor had not been valued as a going

20    concern, he acknowledged that the Bank had not commissioned any appraisals to support that

21    concern.  No evidence was presented on this point.

22        Mr. Mesmer did not take serious issue with the proposed floating prime plus 1.5%,

23    as an interest rate going forward, and offered no alternative interest rate for the court's consideration.

24        Mr. Mesmer also attempted, through a pie chart (Ex. C) to demonstrate his concern

25    that the Debtor's landlord, Marana Cinemas Associates, was receiving proportionately more on its

26    debt than was the Bank.

27        Finally, Mr. Mesmer did not seriously question the Plan's feasibility, and generally

28    acknowledged that it was, indeed, feasible.

10

However, what appeared to be a thorny issue for the Bank was that the landlord was realizing much more under its modified lease than was the Bank (*see* Ex. B and C).

## II. <u>OBJECTIONS TO THE PLAN</u>

By confirmation, the only remaining objection to the Debtor's reorganization Plan was that of the Bank.[5] In summary, the Bank's objections were:

1. The Plan violated 11 U.S.C. § 524(e), and therefore the debtor could not clear the statutory hurdles of §§ 1129(a)(1) and (2).

2. The Plan was speculative and therefore not feasible. Section § 1129(a)(11).

3. The Plan violated the absolute priority rule. Section 1129(b)(2)(B)(ii).

4. The Plan was unfair because the provisions for alternative treatment of the Bank, depending on how it voted, were not appropriate.

Before dealing with the objections, the court will consider the "unopposed" elements of § 1129(a).

## III. <u>THE CONFIRMATION ELEMENTS OF § 1129--THE 16 ELEMENTS</u>

Confirmation has two major parts: (1) the § 1129(a) factors, comprised of 16 separate areas of inquiry and proof, and (2) § 1129(b)'s scrutiny for whether a plan treats dissenting classes fairly and equitably. If it is found to have done so, a plan can be confirmed in spite of any objections, and dissenters will be bound by the plan. Section § 1141.

The court is charged with the responsibility of determining whether a debtor has proven each of the applicable elements of § 1129. It does this by measuring the factual evidence against the appropriate legal standards.

_____

[5] Pima County had originally objected to the Plan, but by confirmation, had agreed with its ultimate treatment and voted to accept the Plan.

1    For the moment, the court will defer its discussion of §§ 1129(a)(1), (2) and (11), and

2    will focus on the other 13 elements.

3

4                    A.  **Section 1129(a)(3)--Good Faith**

5

6        Good faith is an inherent requirement which runs throughout the entire Bankruptcy

7    Code.  Because the bankruptcy court is a court of equity, as well as a court of law, and because of

8    the fluidity of bankruptcy proceedings, equity demands a constant balancing of the competing needs

9    of the various constituencies.  It is essential that bankruptcy proceedings be transparent, candid and

10   always operate in that spirit.

11       In its most basic sense, "good faith" means honesty in purpose, faithfulness to one's

12   duty or obligation, observance of concepts of fair dealing, and the absence of intent to defraud or

13   to seek unconscionable advantage.  BLACK'S LAW DICTIONARY  (9th ed. 2009).  The bankruptcy

14   definition most commonly applied is that the good faith, which is needed to confirm a plan of

15   reorganization, requires the plan to achieve a result consistent with the objectives and purposes of

16   the Bankruptcy Code.  In re Sylmar Plaza, L. P.,  314 F.3d 1070, 1074 (9th Cir. 2002) *(citing* In re

17   Corey, 892 F.2d 829, 835 (9th Cir.1989)); In re Stolrow's, Inc., 84 B.R. 167, 172 (9th Cir. BAP

18   1988); In re Jorgensen, 66 B.R. 104, 108-09 (9th Cir. BAP 1986).  In order to determine good faith,

19   a court must inquire into the totality of circumstances surrounding the plan, the application of the

20   principals of fundamental fairness in dealing with creditors, and then decide whether the plan will

21   fairly achieve a result consistent with the objectives and purposes of the Code.  Sylmar Plaza,  314

22   F.3d at 1074; Stolrow's, 84 B.R. at 172; Jorgensen, 66 B.R. at 109; *see also* In re Kemp, 134 B.R.

23   413, 414-15 (Bankr. E.D. Cal. 1991); In re Jasik, 727 F.2d 1379, 1383 (5th Cir. 1984).

24       The Debtor here has moved swiftly through the process, complied with its duties and

25   sought no continuances.  No creditor has objected on good (or bad) faith grounds.

26       The court therefore finds that the Debtor has met the requirements of good faith, as

27   provided by § 1129(a)(3)

28   .

                                12
Case 4:10-bk-14551-EWH   Doc 95   Filed 11/24/10   Entered 11/24/10 15:47:02   Desc
                Main Document     Page 12 of 43

**B. Section 1129(a)(4)--Professional Fees**

The Debtor intends to ask the court to approve its professional fees as reasonable. This element has been satisfied.

**C. Section 1129(a)(5)--Future Management**

The Debtor has disclosed its future management structure. Indeed, continued service by prior management may be inconsistent with the interests of creditors and public policy if it directly or indirectly perpetuates incompetence, lack of discretion, inexperience or affiliations with groups inimical to the best interests of the debtor. In re Beyond.com Corp., 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003) *(citing* In re Polytherm Indus., Inc., 33 B.R. 823, 829 (W.D. Wis. 1983)); In re Sherwood Square Assocs., 107 B.R. 872, 878 (Bankr. D. Md. 1989); In re SM 104 Ltd., 160 B.R. 202 (Bankr. S.D. Fla. 1993) (manager who diverted rents, violated court orders, made misrepresentations to secured creditors, commingled funds and maintained a grossly inadequate accounting system, was prohibited by § 1129(a)(5) from continuing in that capacity). Those types of problems are not evident here. To the contrary, the Debtor has been well-managed by its principals, who have ethically and responsibly cared for the Debtor and its creditors. No party has objected on this ground.

The Debtor has satisfied its burden as to § 1129(a)(5).

**D. Section 1129(a)(6)--Governmental Rate Control**

This element of § 1129(a) is inapplicable to this Debtor. No creditor or class raised an objection on this ground, and thus the court finds that § 1129(a)(6) does not apply.

13

# E. Section 1129(a)(7)--Best Interests of Creditors Test

This section of § 1129(a) requires, with respect to each impaired class of claims or interests, that each holder of a claim or interest in the class either accept the plan or receive under the plan at least as much as it would receive on liquidation. In re Mid Pac. Airlines, Inc., 110 B.R. 489 (Bankr. D. Haw. 1990). This is commonly referred to as the "best interests of creditors test." In re M. Long Arabians, 103 B.R. 211, 215 (9th Cir. BAP 1989).

In its Amended Disclosure Statement (ECF No. 66) the Debtor detailed its best estimation of how creditors would fare in a hypothetical liquidation. For unsecured creditors, the estimated recovery for each unsecured claim was zero.

The Plan proposes to pay trade debt 100% of their claims, plus interest.[6] This class voted in favor of the Plan. This element is therefore satisfied. the Bank, as a fully secured creditor, lacks standing to argue over this provision, which the affected class has approved.

The Debtor has therefore sustained its burden of proof relative to § 1129(a)(7), and that element of § 1129 has been satisfied.

# F. Section 1129(a)(8)--Each Class Must Accept or is Left Unimpaired

This provision of the Code is the counterpart of §§ 1129(a)(10) and 1129(b)(1). If each class accepts or is left unimpaired, this provision is satisfied. If one or more classes dissent and reject the plan, then the debtor must have at least one other impaired class which consents to the plan. § 1129(a)(10). Then, if all of the other § 1129(a) factors are satisfied, the case may proceed to the fair and equitable considerations of § 1129(b) (the "cramdown").

Here, the Debtor cannot satisfy § 1129(a)(8) because it does not have unanimous class consent for its Plan. Class 3, the Bank, has objected. All other voting classes have consented to the Plan.

---

[6]     In addition, the unsecured "convenience" class has chosen to accept either 50% or $500.

Case 4:10-bk-14551-EWH    Doc 95    Filed 11/24/10    Entered 11/24/10 15:47:02    Desc
Main Document      Page 14 of 43

But, since it has at least one impaired consenting class, § 1129(a)(8) simply becomes inapplicable, and is replaced by § 1129(a)(10) and § 1129(b)(1).

### G. Section 1129(a)(9)--Priorities

The taxing authorities are being paid as the Plan proposes, and have not objected. The Debtor has satisfied § 1129(a)(9).

### H. Section 1129(a)(10)--At Least One Impaired Consenting Class

As noted above, in the § 1129(a)(8) discussion, the Debtor has cleared this statutory hurdle, because it has several impaired classes, not including "insiders," which have voted in favor of the Plan.

Section 1129(a)(10) has been satisfied.

### I. Section 1129(a)(12)--Fees

The U.S. Trustee has not objected on the grounds that its fees, or related fees, are unpaid. No creditor has suggested that compliance with this section is incomplete.

The court therefore finds and concludes that this provision of the Code has been satisfied.

### J. Section 1129(a)(13)--Retiree Benefits

No party has objected to the Debtor's Plan on the basis that the Debtor has violated this provision of the Bankruptcy Code, because this section does not apply.

Accordingly, the court finds that § 1129(a)(13) is inapplicable.

Case 4:10-bk-14551-EWH    Doc 95    Filed 11/24/10    Entered 11/24/10 15:47:02    Desc
Main Document    Page 15 of 43

1    **K.  Section 1129(a)(14)--Domestic Support Obligations (Alimony; Child Support)**

2

3          This section is not applicable to this Debtor.

4

5               **L.  Section 1129(a)(15)--Individual Chapter 11 Case**

6

7          This section is not applicable to this Debtor.

8

9                  **M.  Section 1129(a)(16)--Transfers of Property**

10

11         The final version of the Plan does not intend to transfer any of the Debtor's assets.  No

12   creditor or class has opposed confirmation on this ground.

13         Therefore, this section does not apply.

14

15    **IV.  ADDRESSING THE BANK'S OBJECTIONS UNDER SECTION 1129(a)**

16

17         As for the remaining elements of § 1129(a), the Bank has objected on §§ 1129(a)(1),

18   (2) and (11) grounds.  In inverse order, the court will discuss those objections.

19

20                    **A.  Section 1129(a)(11)--Feasibility**

21

22         Feasibility is the heart of every Chapter 11 reorganization case.  It is the most

23   important element of § 1129(a).  Section 1129(a)(11) permits confirmation only if:

24
                    Confirmation of the plan is not likely to be followed by the
25               liquidation, or the need for further financial reorganization, of
                 the debtor or any successor to the debtor under the plan, unless
26               such liquidation or reorganization is proposed in the plan.

27   "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise

28   creditors and equity security holders more under a proposed plan than the debtor can possibly attain

16

after confirmation." In re Pizza of Haw., Inc., 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 COLLIER ON BANKRUPTCY ¶ 1129.02[11], at 1129-34 (15th ed. 1984)).

"A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable. . . .The prospect of financial uncertainty does not defeat plan confirmation on feasibility grounds since a guarantee of the future is not required. . . . The mere potential for failure of the plan is insufficient to disprove feasibility." In re Patrician St. Joseph Partners Ltd. P'ship, 169 B.R. 669, 674 (D. Ariz. 1994).

Every debtor is required to present "ample evidence to demonstrate that the Plan has a reasonable probability of success." In re Acequia, Inc., 787 F.2d 1352, 1364 (9th Cir. 1986); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1129.02[11], at 1129-52, (16th ed. 2010). Section 1129(a)(11) "requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan." Id. at 1129-53 (citation omitted). In order to determine whether § 1129(a)(11) is satisfied, a court must "scrutinize the plan to determine whether it offers a reasonable prospect of success and is workable." In re Sagewood Manor Assocs. Ltd. P'ship, 223 B.R. 756, 762 (Bankr. D. Nev. 1998). Plans which are based on speculation are not proper candidates for reorganization. Pizza of Haw., *supra.*

In evaluating the feasibility of a plan, the Ninth Circuit's BAP has directed courts to consider several factors, including: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. In re Wiersma, 324 B.R. 92, 113 (9th Cir. BAP 2005), *aff'd in part and rev'd in part on other grounds,* 483 F.3d 933 (9th Cir.2007).

If a final payment, in the form of a "balloon" payment, is proposed to come from new financing to be acquired by the Debtor in the form of some new lending vehicle, then proof of feasibility is necessary. Whether that balloon payment can likely be made, and new financing acquired, requires credible evidence proving that obtaining that future financing is a reasonable likelihood. *See* In re Inv. Co. of The Southwest, Inc., 341 B.R. 298, 311, 314, 316 (10th Cir. BAP

1  2006) (plan not feasible where there was no evidence to demonstrate how the debtor would be able
2  to fund required balloon payments).

3          A court may not confirm a plan if its feasibility depends on future refinancing, unless
4  there is an adequate evidentiary showing that such refinancing is likely to occur. *See* In re Made
5  in Detroit, Inc., 299 B.R. 170, 179-80 (Bankr. E.D. Mich 2003) (plan not confirmed when proponent
6  made inadequate showing of ability to obtain financing); In re Vanderveer Estates Holding, LLC,
7  293 B.R. 560 (Bankr. E.D.N.Y. 2003) (similar); In re Walker, 165 B.R. 994 (E.D. Va. 1994) (similar
8  with respect to future sale of property).

9          Here, several witnesses testified as to the Plan's feasibility, their testimony was
10 credible and the current performance and future projections show that the Plan is feasible.

11         As for future management concerns, this proof is also critical in evaluating the
12 feasibility of a reorganization plan. *See, e.g.,* In re Gulph Woods Corp., 84 B.R. 961, 974 (Bankr.
13 E.D. Pa. 1988); In re Rusty Jones, Inc., 110 B.R. 362, 367, 372, 375 (Bankr. N.D. Ill. 1990) (finding
14 Chapter 11 plan not to be feasible, in part, because "there can be no assurance of proper
15 management in the future" due to management's lack of experience in the debtor's business and their
16 prior bad acts).

17         Here, after considering each piece of evidence presented by both sides, both written
18 and oral, the court finds and concludes that the Debtor has met its evidentiary burden.  The
19 cumulative witness testimony presented by the Debtor was frank, honest and persuasive, and it was
20 presented by individuals who have credible personal and professional credentials.  Their testimony
21 was to the point, and it was believable.  After considered review of the evidence, the court concludes
22 that the weight of the evidence, on all aspects of feasibility (current payments, interest rate and a
23 balloon in seven years time) was credible.

24         In this case, the court is persuaded that the Debtor proved its feasibility case by a
25 cumulative approach, whereby the court was able to meld the facts and opinions from several
26 sources, rather than rely exclusively on the opinions of a single witness.

27
28

18

1      Weighing the evidence, the court finds and concludes that feasibility has been proven,

2   and that the interest rate proposed by the Debtor is representative of the current market.  On the

3   entire record before the court, the Plan is feasible and the interest rate is fair and equitable.

4      The discussion on interest rates is found, *infra*, in Section V.A.

5      The Debtor proved § 1129(a)(11).

6

7                  **B.  Sections 1129(a)(1) and (2)--General Compliance**

8

9      These sections require that the plan and plan proponent (here, the Debtor) have

10  complied with applicable bankruptcy law.  This means that the law has been followed throughout

11  the administrative portion of the case, appropriate fees and reports have been tendered, that the court

12  and creditors have been privy to financial information, that in all respects a debtor has been

13  transparent and candid in its communications, and that it has materially complied with the

14  substantive bankruptcy statutes and rules.

15     The Bank has objected on the grounds that the Debtor has not complied with these

16  sections, because it asserts that the Plan violates § 524(e).

17     Here, the administrative record supports the finding that the elements of §§ 1129(a)(1)

18  and (2) have been met, if one <u>excludes</u> the § 524(e) argument.  All necessary professionals in the

19  case have been appointed by the court, fees for those professionals have been or will be disclosed

20  and vetted, and procedures for noticing out the Debtor's Plan with adequate disclosure (§ 1125) have

21  been followed.  There has been no assertion that the solicitation process for votes has been tainted

22  or is otherwise improper.  Therefore, it appears that, in general, these provisions of the Bankruptcy

23  Code have been satisfactorily met.

24     But the § 524(e) objection deserves careful and serious scrutiny.  If the Bank is correct

25  in its objection, then §§ 1129(a)(1) and (2) will not have been met, and confirmation must be

26  rejected.  But, if the § 524(e) objection is misplaced, then the Plan can move forward to the

27  "cramdown" analysis of § 1129(b).

28

1     **1.** <u>**Section 524(e)--Affecting Another's Liability**</u>

2

3         In pertinent part, § 524(e) provides that "discharge of a debt of the debtor does not

4 affect the liability of any other entity on, or the property of any other entity for, such debt."

5         As noted above, the members of the Debtor are the Daniel G. Cutler and Linda L.

6 Cutler Revocable Living Trust dated June 17, 1997, and Kent Edwards, who is Debtor's managing

7 member. Kent Edwards is also the managing member of Grand Cinemas, LLC. Angela Edwards

8 is his wife. Daniel and Linda Cutler are the parents of Angela Edwards and the Directors of Cutler

9 Fire Protection, Inc.

10         In connection with the loan agreement between Debtor and the Bank, in October 2006,

11 Cutler Fire Protection, Inc., Grand Cinemas, LLC, Kent and Angela Edwards, on behalf of

12 themselves individually, and Daniel and Linda Cutler, on behalf of themselves individually and as

13 Trustees of the Daniel G. Cutler and Linda L. Cutler Revocable Living Trust dated June 17, 1997,

14 executed "Unconditional" Guaranties of payment for all outstanding sums under the loan. The latter

15 six executed a "First Amendment to the Unconditional Guaranty" on March 26, 2007. *See*

16 Guaranties.[7] The Guarantors also executed security agreements and/or deeds of trust encumbering

17 their assets.

18

19               **2.** <u>**Arizona Law**</u>

20

21         The Guaranties are contracts enforceable under Arizona law. *See* <u>Tenet Healthsystem</u>

22 <u>TGH, Inc. v. Silver</u>, 203 Ariz. 217, 219, 52 P.3d 786, 788 (App. 2002) (guarantor's liability is

23 controlled by the terms of the guaranty contract); <u>Hofmann Co. v. Meisner</u>, 17 Ariz. App. 263, 265,

24 497 P.2d 83, 85 (1972). These Guaranties are of payment and not collection. A guaranty of

25 payment is an unconditional promise to pay without requiring the creditor to exhaust all remedies

26 _____

27      [7]     *See* Adversary Case No. 4-10-ap-00846-JMM, ECF No. 9, Ex. 2 to Declaration of Ran Cohen Supporting Bank of Arizona's Opposition to Debtor's Application for Preliminary

28 Injunction. The court takes judicial notice of its own records. *See* <u>United States v. Wilson</u>, 631 F.2d 118, 119 (9th Cir. 1980).

against the debtor. <u>Tenet Healthsystem TGH</u>, 203 Ariz. at 222, 52 P.3d at 791. In contrast, under a guaranty of collection, a guarantor is not liable to the creditor unless the debtor is insolvent or otherwise unable to pay. <u>Id.</u>, 203 Ariz. at 220-21, 52 P.3d at 789-90.

Section 6.13 of the Guaranties provided that the Guarantors' obligations are independent of the borrower's obligations and "[i]n the event of any default hereunder, Lender may institute a separate action against any Guarantor with or without joining or instituting a separate action against the Borrower or any Guarantor or other obligor." *See also* <u>United States v. Buffalo Coal Mining Co.</u>, 343 F.2d 561, 565 n.1 (9th Cir. 1965) (guarantees of payment could be enforced separately from the primary obligation); *see also* <u>Star Phoenix Mining Co. v. West One Bank</u>, 147 F.3d 1145, 1147-48 (9th Cir. 1998).

Therefore, the Guarantors became liable for the debt as soon as the Debtor defaulted, and the Bank had no obligation to seek payment from the Debtor first, but was entitled to proceed directly against the Guarantors, who subsequently allegedly breached their Guaranties by failing to make payment. Accordingly, the Bank filed suit against the Guarantors in Pima County Superior Court on February 12, 2010. (<u>Bank of Arizona v. Linda Vista Cinemas, LLC; et al.</u>; Cause No. C20101142). The Bank is also moving against all non-debtor assets standing as additional collateral for the Debtor's obligation to it.

### 3. <u>Injunction Relief in Bankruptcy Court</u>

After the Chapter 11 case was filed, the bankruptcy court granted a preliminary injunction in order to stay the lawsuit and collection activities "during the pendency of this bankruptcy case" on condition that a confirmation hearing would be held on October 27, 2010, which it was. *See* Order (July 7, 2010), ECF No. 14, Adv. No. 10-00846. This was a temporary, pre-confirmation injunction, authorized under § 105(a) pursuant to <u>In re American Hardwoods, Inc.</u>, 885 F.2d 621 (9th Cir. 1989) (stating that a bankruptcy court lacks jurisdiction and power to enjoin a creditor permanently, beyond confirmation of a plan, from enforcing a state court judgment against the debtor's guarantors).

Case 4:10-bk-14551-EWH    Doc 95    Filed 11/24/10    Entered 11/24/10 15:47:02    Desc
Main Document    Page 21 of 43

1    Currently in controversy is a provision in the Plan which would enjoin legal actions

2    against the Guarantors for the duration of the Plan term, and so long as Plan payments are timely

3    made pursuant to the Plan.  The Class 3 treatment for the Bank's claim (whether or not it accepts the

4    Plan)  provides:

5

6            In consideration for the Guarantors funding the Plan payments, Bank
             of Arizona will not pursue its State Court Action against any of the Guarantors
7            unless the Reorganized Debtor defaults on a payment under the Plan.  To the
             extent Bank of Arizona receives any payment from the guarantors the debt
8            owed shall be reduced accordingly.

9    First Amended Plan at 10-1, ECF No. 65.

10           The Plan provides for full payment of the Bank's $3,131,977.74 secured claim.

11   Treatment for the Bank will include a reamortization of the loan over 20 years, interest only

12   payments in months 1-24, interest and principal payments in months 25-84, with floating interest

13   at the National Prime Rate plus 1.5%, and payment of the claim in full by the seventh anniversary

14   of the Effective Date of the Plan.

15           Under the Plan, the Guarantors will provide financial and/or professional support.  The

16   Plan states that it will be funded from cash on hand and operational income, but if those funds are

17   insufficient, then the Equity Security Holders (the Guarantors) "will contribute additional capital

18   to make the required payments." First Amended Plan at 14, ECF No. 65.  The Debtor estimates the

19   Guarantors will contribute over $437,000 over the Plan term. *See* Debtor's Memorandum in support

20   of confirmation (October 25, 2010) at 9, ECF No. 85.  In addition, Kent Edwards will continue in

21   his role as manager of the reorganized debtor.  With these contributions, the Debtor anticipates that

22   it could complete Plan funding.  The evidence shows that the Guarantors are committed to the

23   success of the Debtor. The Cutlers have already contributed approximately $4 million to the Debtor

24   for operations and debt service, while the Debtor will benefit from Kent Edwards' experience as the

25   manager of three movie theaters in Tucson.  However, if the Guarantors are required to defend

26   against a state court lawsuit, their assets will be diminished as well as their ability to focus on the

27   reorganization, the Plan will be put in jeopardy, and they may be forced to file their own bankruptcy

28   cases.

1    The Debtor describes the contested provision as a "temporary conditional injunction

2    delaying the Bank's ability to enforce its guaranty actions against the Debtor's Guarantors." *See*

3    Debtor's Supplemental Memorandum in Support of Confirmation (November 2, 2010) at 1, ECF

4    No. 89.  In addition, the Debtor argues that the Plan "cures" the default, which default triggered the

5    actions against the Guarantors.

6    The Bank objects to this provision as violating both § 524(e) and the Court's

7    temporary injunction order by imposing "an almost permanent injunction and release" of the non-

8    debtor Guarantors. *See* Bank of Arizona's Objection to Confirmation (October 19, 2010) at 6, ECF

9    No. 81.  The Bank maintains that the injunction provision is  illegal even if it is limited in time.

10   The issue of whether the court can temporarily delay legal actions against nondebtor

11   guarantors *for the duration of the plan*, post-confirmation, has not been specifically addressed by

12   the Ninth Circuit Court of Appeals.  Although our Circuit has held that the "maximum" injunctive

13   relief against a nondebtor is "until confirmation of a reorganization plan," In re Excel Innovations,

14   Inc., 502 F.3d 1086, 1095 (9th Cir. 2007) (*citing* American Hardwoods, 885 F.2d at 624-27), those

15   cases involved pre-confirmation proceedings.  But, in American Hardwoods, the debtor sought a

16   permanent injunction which the Ninth Circuit found to be an invalid attempt to discharge third

17   parties.  Id. at 625-26.

18   In contrast, the issue here is whether a bankruptcy court has the power to take the next

19   step beyond  plan confirmation, and approve a temporary, conditional injunction in order to ensure

20   the successful implementation and completion of  the plan without collateral disruption of the

21   Guarantors' affairs.

22   Both sides rely, in part, on a case in which the District Court for the District of

23   Arizona reversed the bankruptcy court's approval of a similar plan proposal on the reasoning of a

24   Ninth Circuit BAP opinion.  *See* In re Regatta Bay, LLC, 406 B.R. 875 (Bankr. D. Ariz. 2009),

25   rev'd, 2009 WL 5730501 (D. Ariz. 2009) (citing In re Rohnert Park Auto Parts, Inc., 113 B.R. 610

26   (9th Cir. BAP 1990)).

27

28

23

**4.  <u>Section 105(a) and Section 524(e): Rhonert Park and Regatta Bay</u>**

The bankruptcy court may not confirm a plan of reorganization that does not comply with applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). The bankruptcy court's equitable power to issue an injunction is found in § 105(a), which authorizes orders necessary or appropriate to carry out provisions of the Bankruptcy Code. However, § 105(a) has a limited scope and can only be exercised within the confines of the Code. *See generally* <u>Norwest Bank Worthington v. Ahlers</u>, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988).

When a plan attempts to "affect the liability" of a nondebtor, the bankruptcy court's power under § 105(a) is limited by § 524(e) which provides, with a nonapplicable exception:

> (e)     Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

11 U.S.C. § 524(e); <u>American Hardwoods</u>, 885 F.2d at 625-26.

The only comment in the legislative history of § 524(e) is merely that it "provides the discharge of the debtor does not affect co-debtors or guarantors." S.Rep. No. 989, 95th Cong., 2d Sess. 81 (1978); <u>see also</u> <u>Star Phoenix Mining Co.</u>, 147 F.3d at 1147 n.2 ("[D]ischarge of the principal debtor in bankruptcy will not discharge the liabilities of codebtors or guarantors."); <u>Underhill v. Royal</u>, 769 F.2d 1426, 1432 (9th Cir.1985) ("Generally, discharge of the principal debtor in bankruptcy will not discharge the liabilities of co-debtors or guarantors.").

Section 524(e), of the 1978 Bankruptcy Reform Act, was a re-enactment of Section 16 of the 1898 Act which provided: "[t]he liability of a person who is a co-debtor with, or guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt." Act of July 1, 1898, ch. 541 § 16, 30 Stat. 550 (formerly codified at 11 U.S.C. § 34 (1976)). "The import of Section 16 [of the 1898 Act] is that the mechanics of administering the federal bankruptcy laws, no matter how suggestive, do not operate as a private contract to relieve co-debtors of the

bankrupt of their liabilities." Underhill, 769 F.2d at 1432 (quoting Union Carbide Corp. v. Newboles, 686 F.2d 593, 595 (7th Cir. 1982)).[8]

"Pursuant to 11 U.S.C. § 524(a), a discharge under Chapter 11 releases the debtor from personal liability for any debts. Section 524 does not, however, provide for the release of third parties from liability" because § 524(e) "precludes bankruptcy courts from discharging the liabilities of non-debtors." In re Lowenschuss, 67 F.3d 1394, 1401 (9th Cir. 1995). *See generally* Hon. Joan N. Feeney, BANKRUPTCY LAW MANUAL § 11A:67 (noting "substantial disagreement in the courts on whether, or the circumstances under which, a plan and order confirming it may provide for releases of or injunctions favoring nondebtor entities," and comparing Airadigm Comm. with Lowenschuss.

In Lowenschuss, the Ninth Circuit Court of Appeals cited well-established law such as American Hardwoods and Underhill, and rejected an exception based on circumstances, such as

---

[8]     In Union Carbide, the Seventh Circuit Court of Appeals disapproved a plan provision purporting to discharge the debtor's guarantors and held that Section 16 of the Bankruptcy Act of 1898 made "clear that the discharge of [the debtor] itself had no effect upon the liability of [the guarantors] on the note . . . ." Id. at 595. The Seventh Circuit has held that Union Carbide is no longer controlling on the issue of whether all non-debtor releases are prohibited under the current version of § 524(e). In re Airadigm Communications, Inc., 519 F.3d 640, 555-56 & n.4 (7th Cir. 2008). That opinion stated, at 656:

In any event, § 524(e) does not purport to limit the bankruptcy court's powers to release a non-debtor from a creditor's claims. If Congress meant to include such a limit, it would have used the mandatory terms "shall" or "will" rather than the definitional term "does." And it would have omitted the prepositional phrase "on, or ... for, such debt," ensuring that the "discharge of a debt of the debtor shall not affect the liability of another entity"-whether related to a debt or not. See 11 U.S.C. § 34 (repealed Oct. 1, 1979) ("The liability of a person who is a co-debtor with, or guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt.") (prior version of § 524(e)). Also, where Congress has limited the powers of the bankruptcy court, it has done so clearly-for example, by expressly limiting the court's power, see 11 U.S.C. § 105(b) ( "[A] court may not appoint a receiver in a case under this title"), or by creating requirements for plan confirmation, see, e.g., 11 U.S.C. § 1129(a) ("The court shall confirm a plan only if the following requirements are met...."). As a result, for the reasons set out in *Specialty Equipment*, § 524(e) does not bar a non-consensual third-party release from liability.

In re A.H. Robins Co., 880 F.2d 694 (4th Cir. 1989), as being inconsistent with the explicit and limited cases entitled to injunctions issued in connection with a reorganization plan provided by § 524(g). Id. at 1402 & n.6. The Ninth Circuit also cited the BAP's Rohnert Park decision.

In Rohnert Park, the debtor had been a partnership prior to incorporation. Creditor Seaport Automotive Warehouse, Inc. ("Seaport") sold automotive parts and supplies to the individual partners and the partnership, and was unaware of the incorporation for approximately six months. Upon learning of it, Seaport demanded personal guarantees but none were made. Seaport initiated an action in state court to collect amounts due for goods sold and delivered and attached the defendants' assets, including their stock in the debtor. The debtor filed for bankruptcy protection. Seaport filed an untimely proof of claim, which was barred, such that it would not receive any distribution under the plan.

The proposed reorganization plan contained a provision which enjoined creditors from taking any collection efforts against the debtor as well as the individual partners for a period of five years, pending completion of the plan.

Seaport objected to that provision. The bankruptcy court overruled the objection for lack of standing and confirmed the plan. On appeal to the BAP, Seaport was determined to have standing because its rights were affected by the plan. Id., 113 B.R. at 613-14. The BAP held that although the bankruptcy court had jurisdiction, it lacked the power to issue such an injunction under § 105(a) because the plan violated § 524(e). In reversing the bankruptcy court, the BAP quoted American Hardwoods, where the Ninth Circuit Court of Appeals stated:

> Section 105 empowers the court to enjoin preliminarily a creditor from continuing an action or enforcing a state court judgment against a nondebtor prior to confirmation of a plan. In re A.H. Robbins Co., 828 F.2d 1023, 1026 (4th Cir.1987), cert. denied, 485 U.S. 969, 108 S.Ct. 1246, 99 L.Ed.2d 444 (1988); A.H. Robins Co. v. Piccinin, 788 F.2d 994, 1002-03 (4th Cir.), cert. denied, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). Furthermore, section 105 permits the court to issue both preliminary and permanent injunctions after confirmation of a plan to protect the debtor and the administration of the bankruptcy estate. See [ In re Burstein-Applebee Co., 63 B.R. 1011, 1020-21 (Bankr. W.D. Mo.1986) ] ... In re Askew, 61 B.R. 87, 89 (Bankr. S.D.Ohio 1986) ... [Debtor], however, *points to no case, and we are aware of none, in which a court permanently enjoined, past confirmation of a plan, a creditor from enforcing a state court judgment against a nondebtor guarantor of a contract liability.*

American Hardwoods, 885 F.2d at 624-625 (emphasis added).

The BAP held that the plan provision affected the "liability of the co-debtors of the debtor as to the debt owed to Seaport" for the five years that Seaport would be prohibited from proceeding against them, and therefore the provision violated § 524(e). Rhonert Park, 113 B.R. at 616-17. The BAP also concluded that "it would be inequitable to hold that a creditor whose claim is held time barred, and who is unable to benefit from the Plan, to be bound by a provision of the Plan enjoining pursuit of a claim against guarantors of the debtor." Id. at 617.

It is this court's opinion that the BAP, in assessing Ninth Circuit law, unnecessarily conflated the prohibition against a permanent injunction with *any* injunction "past confirmation." American Hardwoods, 885 F.2d at 625. The holding in Rhonert Park was largely based on equitable considerations which weighed in favor of the creditor. *See, e.g.,* Excel Innovations, 502 F.3d at 1093-94. In addition, whether a plan provision "affects the liability" of non-debtors is a mixed question of fact and law, according to the Rhonert Park disposition.

This analysis is supported by the case cited in the parties' papers, Regatta Bay. The case is aptly summarized in Hon. Dennis Montali, Cecily A. Dumas and Ron M. Oliner, *Recent Developments in Business Bankruptcy -- 2009*, 30 CAL. BANKR. J. 439 (2010), in a section entitled "It's OK For A Plan To Temporarily Prevent Creditors From Going After Co-Debtors":

> In this case [Regatta Bay], the debtor (a condominium developer) proposed and confirmed a plan providing for full payment all its creditors, but prohibiting a certain judgment creditor (the developer of a competing condominium) from trying to collect against the debtor's codefendant principals, who were contributing a substantial sum to fund the plan's operation, until after payments were complete on the condominium's first mortgage. The creditor considered this restriction on its ability to recover from the debtor's principals to be a violation of § 524(e), and so appealed the confirmation order and applied for a stay pending appeal. The bankruptcy court disagreed, concluding that a temporary restriction on the creditor's enforcement rights was not the equivalent of the permanent injunctions courts had invalidated under § 524(e), and predicting that the Ninth Circuit, in an appropriate case, would agree. Whether such a restriction on third-party collection was permissible in a Chapter 11 plan would instead hinge on whether the restriction was "fair and equitable." Here, the judgment creditor's immediate attempt to recover from the principals would hinder their ability to contribute toward the plan's funding, which in turn could make the entire plan fall apart and prevent what would otherwise be full recovery by the debtor's unsecured creditors. The court found that such a result would be the inequitable one, concluded that the judgment creditor's appeal therefore did not

have a substantial likelihood of success, and so denied the request for a stay pending appeal. In re Regatta Bay, LLC, 406 B.R. 875 (Bankr. D. Ariz. 2009) rev'd 2009 WL 5730501 (D. Ariz. Oct. 30, 2009).

A couple of other relevant facts in the <u>Regatta Bay</u> case were that, although the plan proposed full repayment, it did not require monthly payments to the enjoined creditor, but rather proposed to sell the condominiums and pay the creditor from a reserve of sale proceeds upon the resolution of a pending appeal or two and one-half years after confirmation. <u>Id.</u>, 406 B.R. at 876-77. The nondebtors in <u>Regatta Bay</u> were required to make a one-time contribution, none of which went to the enjoined creditor. As a result, the creditor was enjoined from taking actions against the nondebtors for 30 months without receiving any payment in the interim. <u>Id.</u> at 877.

The bankruptcy court in <u>Regatta Bay</u> did not believe it was bound by <u>Rhonert Park</u> because (1) <u>Regatta Bay</u> was not decided under § 105, but rather § 1141(a) (""The injunctive effect flows from the statute itself." <u>Id.</u> at 878); (2) the facts were distinguishable because "there was no showing made [in <u>Rhonert Park</u>] that the co-debtors would contribute to the plan or that their contributions were essential to the success of the plan"; and (3) the pending appeal was in District Court, which would not be bound by the BAP decision.

The District Court reversed the bankruptcy court on the persuasiveness of the BAP's reasoning in <u>Rhonert Park</u> [9] where, it stated, the facts were "very similar." <u>Regatta Bay</u>, 2009 WL 5730501 at * 3. In addition, the court noted there was evidence that other creditors were involved in collection efforts against the principals and the enjoined creditor was placed "at a unique disadvantage." <u>Id.</u> at *2 & n.1. The District Court held that the temporary injunction "affect[ed] the liability" of the nondebtor owners with regards to the debt owed to the enjoined creditor. <u>Id.</u> at *4.

---

[9]   The District Court held that § 1141(a) "cannot serve as the substantive basis for an injunction against nondebtors," after the debtor failed to explain its relevance. *See* 2009 WL 5730501 at * 3 n.2. In <u>Regatta Bay</u>, although the plan had already been confirmed, the bankruptcy court analyzed the probability of success of the appeal on the merits of the legality of the confirmed plan. We decline to address § 1141 as authority for the injunctive relief in that the parties have cited only §§ 105(a) and 524(e). We further note that no published cases have cited <u>Regatta Bay</u> for this theory, while we also acknowledge that litigants in other circuits have alternatively relied upon other Code sections as authority for the issuance of injunctions against nondebtor third parties, with mixed results.

It is clear that the appellate courts in <u>Rhonert Park</u> and <u>Regatta Bay</u> were not *per se* rulings, and the courts considered the factual circumstances in determining whether the plan provisions affected the nondebtors' liability and therefore violated § 524(e). In contrast to the facts in those cases, in the instant case, the facts are neither prejudicial nor onerous toward the creditor Bank. The Guarantors have already substantially paid down the Bank's debt and will continue to make substantial contributions under the Debtor's full repayment Plan, which will be used to make monthly payments to the Bank. The Bank's last payment on the seventh anniversary of the Plan will be a $2.6 million balloon payment, which is feasible. The injunction will last until the earlier of completion of payments or any default under the Plan. There was no evidence presented by the Bank that other creditors were currently pursuing the Guarantors, or that such a possibility existed in the future.

The injunction proposed by the Debtor is neither a "permanent" injunction nor is it a "release" of the Guarantors' liability.[10] "Liability," or responsibility for a debt, is unchanged. Only collection is delayed while payments are made. The injunction simply delays the actions which are preserved under state and federal law and/or orders. *See, e.g.* § 108 (c); <u>In re Bernard Steiner Pianos USA, Inc.</u>, 292 B.R. 109, 115-16 (Bankr. N.D. Tex. 2002) (confirming plan with temporary injunction and tolling provision).[11] Bank of Arizona has not stated that there is a statute of

---

[10] An argument could be made, from the creditor's perspective, that the injunction converts a payment guaranty into a collection guaranty. In other words, the Bank is forced to wait until the Debtor has defaulted under the Plan before it can prosecute its separate claims against the Guarantors. However, the Plan provision does not, in effect, modify the Guarantors' contracts and the Bank retains its full range of remedial power under Arizona law. This is a question of federal bankruptcy court jurisdiction and power to issue the temporary injunction. The bankruptcy court has at least related-to jurisdiction over the Bank's enforcement of its rights to liquidate the collateral pledged by the Guarantors. Such actions could conceivably affect the administration of the Debtor's Plan by disrupting the Guarantors' ability to contribute to the Plan. <u>See</u> <u>American Hardwoods</u>, 885 F.2d at 624. Although the test for related jurisdiction is more restricted post-confirmation, the facts would still meet the "close nexus" test of <u>In re Pegasus Gold Corp.</u>, 394 F.3d 1189, 1194 (9th Cir. 2005). In addition, the bankruptcy court has power to tailor the injunction to provide the necessary relief while limiting the burden on the Bank. *See, e.g.*, <u>Tamako Roofing Prods. v. Ideal Roofing Co.</u>, 282 F.3d 23, 40 (1st Cir. 2002).

[11] Other Texas courts have approved temporary post-confirmation injunctions. <u>See</u> <u>Weaver v. Texas Capital Bank, N.A.</u>, 2010 WL 3119397 (N.D. Tex. August 5, 2010); <u>In re Seatco, Inc.</u>, 257 B.R. 469 (Bankr. N.D. Tex. 2001), *as modified*, 259 B.R. 279 (Bankr. N.D. Tex. 2001).

limitations problem. Nor could there be, since payments are contemplated monthly, and an Arizona six-year limitations statute runs from default (which is cured under the Plan).

### 5. Standard for Imposing Injunctive Relief

To gain injunctive relief, post-confirmation, a debtor would be required to prove traditional injunction standards.

In order to impose the new injunction under § 105(a), the court must balance the relative hardships on the debtor and creditor and conclude that the equities favor imposition of the injunction and confirmation of the plan." In re Brotby, 303 B.R. 177, 190 -91 (9th Cir. BAP 2003); Excel Innovations, 502 F.3d at 1096.

### (a) Reasonable Likelihood of Reorganization

This "is not a high burden" for the debtor. Id. at 1097. As noted in this decision, the Debtor's Plan is feasible and capable of returning 100% to all major constituencies. All creditor classes, except the Bank, agreed with Debtor's Plan.

### (b) Hardships

In balancing the hardships, the court finds that the Bank's collateral remains intact, as does its legal priorities therein, while it receives regular payments at a fair market rate of return. Without the temporary injunction, the Guarantors would be unable to fund the reorganization (and Bank payments), and would themselves end up in Chapter 11 proceedings. At the same time, the legal liability of the Guarantors remains unaffected by the Plan.

## (c) **Public Policy**

Policy favors fewer reorganizations, not more. By stabilizing the Debtor here, and reorganizing its debt with principal-guarantor commitment, saves one business and 50 jobs without sacrificing other parties' assets and businesses needlessly. All told, this micro-economy then succeeds, rather than creates multiple failures. In the end, Debtor, Bank, Guarantors and other creditors come out either fully paid or with assets intact. The court perceives little or no harm to the Bank, on this record, due to a delay and receipt of monthly payments.

## C. **Alternatively, Section 1123 and Marshaling Doctrine**

Alternatively, from the Debtor's perspective, an argument could be made that the Plan "cures" the default by modifying the loan and, in exchange, a temporary, conditional injunction against enforcing the guaranties is only fair. This theory is not "fleshed out" in the papers. The bankruptcy court lacks jurisdiction to declare the guaranties unenforceable when, under Arizona law, the guarantees were allegedly breached and the Bank already filed a complaint in state court. Instead, the court frames this issue as falling under the alternative authority of §§ 1123(b)(1) and (b)(6) and the equitable doctrine of marshaling.

Section 1123(b)(1) provides that a debtor's plan may impair, or in other words, modify the rights of creditors. Under § 1123(b)(6), a plan may "include any other appropriate provision not inconsistent with the applicable provisions of [title 11]." This court explained, above, how the plan provision temporarily enjoining collection by the Bank is not inconsistent with § 524(e). Cf. Brotby, 303 B.R. at 190 (a plan may temporarily enjoin collection by a creditor holding a claim excepted from discharge pursuant to § 1123(b)(6) notwithstanding § 1141(d)(2)).

Judge Haines has explained the application of the marshaling principle to similar facts in Regatta Bay, which this decision incorporates. See 406 B.R. at 881-82. That opinion stated:

> The equitable principle of marshaling effectively means that a plan term such as that at issue here is "fair and equitable" so long as it improves the

likelihood of recovery by unsecured creditors and causes no injury to any creditor.". . . . [T]he plan term is therefore permitted by § 1129(b)(1) . . . . 406 B.R at 882.

The District Court did not expressly address this issue. Even if it impliedly rejected it, this court would not be bound by the District Court's decision.[12]

With neither the Bank's collateral packages nor the liability of the Guarantors altered by the Plan, it is only fair that a temporary injunction extend only so long as the Debtor complies with each and every promise made in its Plan. In this manner, whether directly or through Guarantor contributions, the Bank receives what it would get in any event--access to voluntary payment from its Debtor and its Guarantors, resulting in reduction of its debt, while the Plan operates, with a full payoff at the end of seven years.

### D. **Section 1129(a)--Conclusion**

After its survey of the existing state of Ninth Circuit law, however, this court finds itself bound by what it feels is the Circuit's current precedent. Thus, even though this case is deserving, on the evidence presented, of confirmation, this court cannot get past what it believes to be the Circuit's pronouncements on the § 524(e) issue. Accordingly, the court finds that the Debtor has failed to prove §§ 1129(a)(1) and (2), because the Plan violates § 524(e).

---

[12]     Whether bankruptcy courts are bound by all of the decisions of all of the district judges within the district where the bankruptcy court sits, rather than just the district court that hears a particular case, is still an unsettled question. See In re Silverman, 616 F.3d 1001, 1005 n.2 (9th Cir. 2010) (stating *in dicta*, "that, because district judges within a district do not bind each other, such a requirement could create the same problem of subjecting bankruptcy courts to a non-uniform body of law."); see also In re Barakat, 173 B.R. 672, 679 (Bankr. C.D. Cal. 1994).

# V.  SECTION 1129(b)--THE CRAMDOWN PROVISIONS
## AND UNFAIR DISCRIMINATION

If this case proceeds further, on an appeal, then the other issues raised in the case need to be addressed and decided.

If a debtor is able to prove each of the applicable elements of § 1129(a), it then must run the gauntlet of § 1129(b), commonly known as "cramdown."  What the Code attempts to do in this section is to have the court analyze, for each rejecting and dissenting class, whether the plan treats them "fairly" and "equitably," and does not unfairly discriminate against them.  If a <u>secured</u> class objects, its treatment under the plan must pass through the fire of § 1129(b)(2)(A).  Here, only the Bank has objected.  As noted above, it is a fully secured creditor.

If a debtor cannot satisfy the cramdown elements, contained in § 1129(b), then a plan cannot be confirmed.

## A.  Class 3:  The Secured Debt to Bank of Arizona--Cramdown Interest Rate

### 1.  In General

In order for cramdown to be implemented, and the Plan confirmed over a class' vote against it, the Debtor must show that the Plan does not unfairly discriminate against that dissenter, and that its treatment is "fair and equitable."  These latter terms have defined meanings, and in this case, require that its lien interests remain in place, and if payments are deferred and paid over a term, that those payments have appropriate "value."  This "value" is generally understood to be a market rate of interest, considering the terms, quality of the security and any risk to be borne by the affected creditor.  <u>In re P.J. Keating Co.</u>, 168 B.R. 464, 472 (Bankr. D.Mass 1994) (quoting applicable portion of §1129(b)(2)(A)).  As a result, the interest rate paid to the secured creditor must be an appropriate rate of interest so that the creditor may realize the present value of the secured portion of the claim.  <u>In re Landscape Assocs., Inc.</u>, 81 B.R. 485, 487-88 (Bankr. E.D. Ark. 1987).  If a

Case 4:10-bk-14551-EWH   Doc 95   Filed 11/24/10   Entered 11/24/10 15:47:02   Desc
Main Document    Page 33 of 43

Chapter 11 plan proposes payment of an interest rate below the "range of prevailing market rates for loans of comparable risk and duration" or which does not take into account the actual risk of that loan, confirmation must be denied because the deferred payments will not yield the present value of the claim and, therefore, the plan is not "fair and equitable" and will not satisfy § 1129(b)(2)(A)(i)(II). *See, e.g.,* In re One Times Square Assocs. Ltd. P'ship, 159 B.R. 695, 706 (Bankr. S.D.N.Y. 1993).

Some courts calculate the permissible interest rate for a Chapter 11 plan using a "formula" approach, i.e., starting with a base rate--such as the prime rate or the rate on treasury obligations--and adding a risk factor. *See, e.g.,* Camino Real Landscape Maint. Contractors, Inc., 818 F.2d 1503, 1508 (9th Cir. 1987); In re LWD, Inc., 332 B.R. 543, 556 (Bankr. W.D. Ky. 2005), *aff'd,* 340 B.R. 363 (W.D. Ky. 2006). In Till v. SCS Credit Corp., 541 U.S. 465 (2003), the Supreme Court adopted this formula approach for calculating interest in Chapter 13 cases. Under *Till*, interest on a secured claim is calculated based on the national prime rate and then adding a risk premium--to account for the dual risks of inflation and default. Id.

In light of the difference between the existence of a market for cramdown loans in Chapter 11 cases, and the lack of such a market in Chapter 13 cases, the Till Court acknowledged that a somewhat different analysis may be required in Chapter 11 cases. That is, it may be appropriate for a court to determine the rate of interest in an "efficient" market, assuming such a market exists. Till, 541 U.S. at 477 n.14.

The Ninth Circuit suggests that it is the burden of the debtor in a Chapter 11 case[13] to introduce "sufficient evidence" which will establish that the proposed adjustments to the interest rate will take into consideration "the term of deferment of present use and risk of default, as affected by any security." Camino Real, 818 F.2d at 1507.

---

[13] The Supreme Court in Till places the burden of proof on the creditor in a Chapter 13 plan confirmation dispute to establish the evidentiary predicate for the appropriate "build up" on the prime rate due to the existence of identified risk factors. Till, 541 U.S. at 479.

34

1    It would not be an exaggeration to state that cases abound on this subject, and that

2    "one size does not fit all."  In other words, there are many different kinds of approaches to how this

3    test is met, depending on the unique circumstances of a given case.

4            For example, some authorities in the Ninth Circuit support the use of the blended rate

5    analysis.  In re Boulders on the River, Inc., 164 B.R. 99, 105-06 (9th Cir. BAP 1994) (approving the

6    lender's use of the blended rate methodology to determine the cramdown interest rate on a secured

7    real estate loan under a Chapter 11 plan that provided the creditor with an 88.5% loan to value

8    ratio); In re North Valley Mall, LLC, 432 B.R. 825, at *6-7 (Bankr. C.D. Cal. June 21, 2010)

9    (Albert, J.) (reviewing and analyzing Till and then utilizing the blended rate approach with three

10   "tranches" or tiers:  a "senior tranche" covering the debt up to the first 65% of value, a "mezzanine

11   tranche"  covering the debt up to the next 20% of value, and an "equity tranche"  covering the last

12   15% of value).  Post-Till, in a Chapter 11 income-producing real estate case, the Court in North

13   Valley Mall observed:

14

15           [T]he blended rate approach suggested in cases like *Boulders*
             and in the Reehl and Milner articles is not an attempt to mirror
16           an *actual* market that exists.   Rather, it is an attempt by
             principled approach to create a proxy for a market extrapolated
             from current data such that the court can reach the ultimate
17           question of "present value." . . . .

18           . . . .

19           [I]t [one expert's testimony using this method] makes some
             reasonable attempt to recognize that the level of risk changes
20           depending upon whether a lender is at the 66% mark on the
             collateral, or the 99% mark. Just because the marketplace right
21           now does not quote on mezzanine debt does not change this
             reality nor should it, in the Court's view, constrain the parties
22           from interpolating data in a principled way to recognize this
             difference.   As stated above, the formula or blended rate
23           approach is not merely a mirror of market conditions; rather, it
             is a principled derivation from current data of a proxy rate where
24           no market currently exists.

25   Id. at *6 (alteration added).

26           For at least the last 20 years, the Ninth Circuit Court of Appeals has instructed

27   bankruptcy courts to assess, and whenever possible use a "formula approach," and consider "the

28

risks associated with a given debtor and the security associated with a specific debt." <u>In re Fowler</u>, 903 F.2d 694, 697-99 (9th Cir. 1990); *see also* <u>Camino Real</u>, 818 F.2d at 1508.

As noted, the formula approach was recognized by the United States Supreme Court in <u>Till</u>, 541 U.S. at 479-480. <u>Till</u> recognized that the factors relevant to the risk adjustment fall squarely within the bankruptcy court's area of expertise, and that the court must "select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan." <u>Id.</u> Such adjustments recognized by other bankruptcy courts are generally approved at 1- 3%. <u>Id.</u> at 480.

In <u>Till</u>, the Supreme Court rejected three alternative approaches to setting a cramdown interest rate: the coerced loan, presumptive contract rate, and cost of funds approaches. "Each of these approaches is complicated, imposes significant evidentiary costs, and aims to make each individual creditor whole rather than to ensure the debtor's payments have the required present value." <u>Id.</u> at 477.

As case law has evolved since <u>Till</u>, another approach is obtaining traction. In both <u>In re American Homepatient, Inc.</u>, 420 F.3d 559 (6th Cir. 2005) and <u>Mercury Capital Corp. v. Milford Conn. Assocs., L.P.</u>, 354 B.R. 1 (D. Conn. 2006), these courts urged the bankruptcy courts to first consider whether an "efficient market" exists, and if so, to utilize those rates. If no efficient market exists, then a bankruptcy court should fall back on the formula approach. *See generally* Gary W. Marsh, Matthew M. Weiss, *Chapter 11 Interest Rates After Till*, 84 AM. BANKR. L.J. 209 (Spring 2010) (review of development of cramdown interest rates since 2004).

In the final analysis, though, this court has always taken comfort in the very practical, easily-understood cases from the Ninth Circuit, <u>Camino Real</u> and <u>Fowler</u>. And this court, speaking only for itself, appreciates the understanding of the <u>Camino Real</u> court, where respected Ninth Circuit Judge Joseph Sneed, speaking for the Circuit, observed that the setting of cramdown interest rates carries some degree of subjectivity:

> Finally, the <u>Armour</u> court increased the treasury bill rate by 2% for risk, then decreased it by 1% to account for the security. The government claims that the magnitude of these adjustments was arbitrary. To some degree that may be true. But rough estimates are better than no estimates. We are willing to rely on the expertise of the bankruptcy judge in a case such as this,

36

particularly where no contrary evidence was introduced. A bankruptcy court should be accorded substantial deference in these matters because it has "almost daily experience with the rates charged by actual commercial lenders and other financier's [sic] of chapter 11 debtors." In re Fi-Hi Pizza, 40 B.R. 258, 271 (Bankr. D. Mass.1984). We uphold the bankruptcy court's judgment here.

Camino Real, 818 F.2d at 1508. The Circuit, in Fowler, further asked the trial courts to follow the "guiding principal . . . that the bankruptcy court's findings must be sufficient to allow meaningful review, and must demonstrate to the reviewing court that the bankruptcy judge's determination was supported by the evidence." Fowler, 903 F.2d at 699 n.7.

Although Fowler was a Chapter 12 case, the Circuit found no significant differences to distinguish it from the cramdown exercise in either that Chapter or Chapter 11.[14] In instructing the trial courts on cramdown rates, the Circuit explained that they were to look to either "market interest rates for similar loans" or use the "formula approach" and measure the risk and the security. Id. at 698.

In Fowler, 903 F.2d at 696-97 (citing 5 COLLIER ON BANKRUPTCY ¶ 1225.03[4][c], at 1225-21 (15th ed. 1989)), the Circuit said:

> When the debtor's plan proposes to pay a secured claim in deferred cash installments, the court must find that the present value of the proposed payments is not less than the allowed amount of the secured claim. In order to make this finding, it will be necessary for the court to apply a discount factor to the proposed stream of payments to determine the present value of those payments. This is typically accomplished by ascribing an interest rate to the allowed amount of the claim and by requiring payment of the amount of the claim along with interest at the specified rate.

Whether one starts with a "base rate" and adds for risk, or just accepts that a proven market rate includes relevant risk (in an appropriate case), the result should not vary by much. A contract rate of interest may be evidence of the proper rate for a plan, but it is neither presumptive nor conclusive. See Till, 541 U.S. at 477-78 (rejecting presumptive contract rate approach in favor of the formula

---

[14] Nor has the Ninth Circuit's BAP questioned this logic. See In re Yett, 306 B.R. 287, 290-91 (9th Cir. BAP 2004). See generally David G. Epstein, *Don't Go and Do Something Rash about Cram Down Interest Rates*, 49 ALA. L. REV. 435, 439-42 (Winter 1998); C.B. Reehl, Stephen P. Milner, *Chapter 11 Real Estate Cram-down Plans: The Legacy of Till*, 30 CALIF. BANKR. J. 405 (2010).

approach). In the final analysis, the interest rate determination is to be made on a case-by-case basis. Boulders, 164 B.R. at 105; Camino Real, 818 F.2d at 1508.

Finally, Fowler requires the bankruptcy courts to make "explicit findings" regarding (1) how it assesses the risk of default; (2) how it assesses the nature of the security; (3) what market rates exist for the type of loan at issue; and (4) what risks reduce or heighten the risks associated with a particular debtor. Fowler, 903 F.2d at 699.

With these principles in mind, the court now turns to the facts of this case, and the rate proposed in the Debtor's Plan, to determine if the interest rate meets the test for "value" required by § 1129(b)(2)(A)(i)(II).

## 2. Cramdown Findings

Although the Bank did not expressly object to the proposed interest rate of 4.75%, the court must still find that the rate satisfies the statutory standard of § 1129(b)(2)(A)(i)(II).

Utilizing the "explicit findings" requirement of the Fowler case, the court finds, as to the proposed interest rate and terms of the Bank's restructured Plan debt:

    (a)    The nature of the personal property and real property security (of both the Debtor and the guarantors) is predictable and realizable. Monthly payments add stability to the Plan. The collateral is well-managed by the Debtor, and the Bank has reasonable methods to police its collateral on a regular basis. Post-confirmation reports will be provided by the Debtor. There are appropriate safe-guards in place, under the unaltered provisions of the Bank's loan documents, to enable it to react quickly should the collateral be in danger of deteriorating. (Exs. A and B.) There was no evidence that the real property collateral is depreciating.

    (b)    There are no additional factors associated with this Debtor which would heighten the risk to the Bank. The Debtor has stabilized itself from past problems. Current management has promptly addressed adverse issues

1   and has properly righted itself with regard to its financial controls.  The

2   guarantors are financially stable enough to enable them to assist the

3   Debtor with additional capital contributions if needed.  By receiving

4   monthly interest payments (and in two years will also be receiving

5   principal paydowns as well), the Bank can quickly react to financial

6   difficulties which are not now anticipated, should they develop.

7       The rate proposed in the Plan reflects a market rate, and embedded

8   within that rate is an appropriate risk factor.  No additional risks exist

9   which this court feels requires a premium to be added to the Plan's

10  proposed rate.  Mr. Sanders' opinion of a proper rate is accepted by the

11  court.

12  (c)   The court concludes, based on its finding that the Plan is feasible, that

13        the Debtor is not likely to default or need further reorganization.

14  (d)   The market rate, for the type of restructured loan proposed for the

15        Bank, was proven by a preponderance of the evidence to be the rate set

16        forth by the Debtor's expert witness, Randall P. Sanders.  His years of

17        expertise, in the area in which he testified, persuasively convinced the

18        court that his opinion was objective and consistent with the markets

19        today.  His demeanor in providing testimony was straightforward, easy

20        to understand, and was deeply rooted in experience.

21        Mr. Sanders did not stray from the path of his expertise.  As a result,

22        the court found that his testimony was credible in establishing an

23        appropriate market interest rate, and in proving the feasibility of

24        obtaining a new takeout loan 7 years in the future.

25      The court therefore concludes that the proposed interest rate, for the term set forth by

26  the Plan, is fair and reasonable as to the Bank, and returns to it a fair rate of interest, considering all

27  relevant factors.

28

### 3. **Cramdown Interest Rate as to Secured Creditor--Conclusion**

After assessment of the totality of the evidence surrounding the cramdown interest rate proposed for the Bank, and for the reasons set forth above, the court finds and concludes that the rate proposed by Debtor's Plan is fair and equitable to the Bank, and thereby §§ 1129(b)(2)(A)(i)(II) has been properly proven. This element of "cramdown" is satisfied.

### B. **Section 1129(b)(2)(A)(i)(I)--Retention of Liens (Cramdown)**

The Plan proposes that the Bank retain its existing liens, both as to the Debtor and the guarantors. The Plan does not call for any release of guarantor liability. The continuing guarantees remain intact.

This section of the Code, § 1129(b)(2)(A)(i)(I), is therefore satisfied.

### VI. **MISCELLANEOUS BANK OBJECTIONS**

In addition to the Bank's objections concerning § 524(e) and the feasibility of the Plan, discussed above, the Bank had other objections which will be addressed here.

### A. **The Absolute Priority Rule--Section 1129(b)(2)(B)(ii)**

The Bank also objects to the Debtors' Plan on the basis that it violates the "absolute priority" rule. The Bank's argument on this issue is weak. In the Ninth Circuit, there is but one case supporting the Bank's assertion, a District Court case from the Central District of California, In re Monarch Beach Venture, Ltd., 166 B.R. 428 (C.D. Cal. 1993).

With respect, this court disagrees with the Monarch decision, if it is intended to apply the absolute priority rule to a secured class of creditors. This is because the statute expressly contains the solitary expression of this rule in the section that only deals with unsecured creditors.

§ 1129(b)(2)(B) (ii). The absolute priority rule must not be violated if the <u>unsecured</u> creditors object, which they have not. In fact, the unsecured creditor classes voted in <u>favor</u> of the Plan. And importantly, because the Plan calls for full payment plus interest to the principal unsecured class, the rule is not violated. *See, e.g.,* <u>In re Arden Props., Inc.</u>*,* 248 B.R. 164, 173-74 (Bankr. D. Ariz. 2000) (Haines, J.) ("[T]he absolute priority rule applies only to unsecured classes, not to secured claims, the requirements for which are separately set forth in § 1129(b)(2)(A), which says nothing about the timing of the repayment nor any comparison to the treatment of any other class."); <u>In re Cypresswood Land Partners, I</u>, 409 B.R. 396, 437 (Bankr. S.D. Tex. 2009) (secured creditor lacked standing to object that the plan violated the absolute priority rule).

The only statutory cramdown section that applies to the rights accorded to secured creditors is found in § 1129(b)(2)(A), and an "absolute priority" protection is nowhere to be located within that statute.

The court will not carry coals to Newcastle in further analysis of this argument. The Bank's suggestion, as a secured creditor, that it is entitled to the protections of the absolute priority rule, is rejected, and its objection on that basis will be OVERRULED.

## B. <u>Unfair Discrimination Against Bank of Arizona--Section 1129(b)(1)</u>

This objection is somewhat difficult to follow, but the Bank appears to resent that another class of creditor, the Debtor's landlord, is receiving what it considers more favorable treatment on its claim than is the Bank.

First, the Bank, as a secured creditor, is in a class by itself. The priority of its lien claims (here, personalty) is entirely dependent upon the timing of its recording, and the extent and breadth of its security interest. As between two secured creditors with liens in the same collateral, their rights--against each other--are not impacted by the Plan. The Debtor only seeks to pay each, and the test for each (if they do not vote in favor of the Plan) is strictly decided by the application of the cramdown elements of § 1129(b)(2)(A). That analysis is performed on a <u>class by class</u> basis, and the treatment of any one class is not measured by the treatment accorded another. If a class'

41

treatment is "fair and equitable," and independently complies with § 1129(b)(2), the Plan can be confirmed.

Next, it is not a valid objection, nor "unfair discrimination" to complain that other classes are being treated differently, <u>unless</u> their claims are substantially similar to each other. *See* § 1122(a). Here Marana Cinemas Associates and the Bank are <u>not</u> similar. While they may have liens on the same property, those liens are not equal. One will be in first place and one in second. For lienholders, that difference is substantial and significant.

Finally, as for the Bank versus a landlord, the Code treats landlords differently than other creditors. There is no similar comparison that can be made between the two. They are not similar. For a debtor to treat them differently, then, is neither unfair nor discriminatory.

This objection will be OVERRULED.

## C. <u>Alternative Treatment of the Bank, Depending Upon How It Voted</u>

The Debtor's Plan treated the Bank differently depending upon how it voted. Although the Bank felt that something about this approach was objectionable, in the final analysis, the Bank's vote determined which treatment would be accorded it. It has cited no authority supporting that alternative treatments are unlawful

When the Bank voted against the Plan, the court then had only to consider whether that treatment of its claim was "fair and equitable" as to Class 3. The court has found that its treatment is "fair and equitable."

No party has argued, nor cited authority, that treating a creditor class in alternate ways is inappropriate, nor violative of any statute, since it is the creditor which controls which treatment it prefers.

Therefore, the objection will be OVERRULED.

42

# V.  <u>CONCLUSION</u>

The Debtor's Plan cannot be CONFIRMED.  Except for the 11 U.S.C. § 524(e) issue, the Debtor satisfied the legal requirements for confirmation.  If the court did not feel bound by the Ninth Circuit's precedent, this case would appear to present the appropriate circumstances for a temporal injunction against the Guarantors and their assets, so long as the Debtor complied with the Plan.

The Debtors shall have 30 days within which to file an amended plan.  All stays will remain in effect until further hearings.

A separate order will be entered.  The parties have 14 days within which to appeal. FED. R. BANKR. P. 8002.[15]

DATED AND SIGNED ABOVE.

COPIES served via email on the date signed above:

Michael McGrath, Attorney for Debtor

Gerald Shelley, Attorney for Bank of Arizona

Office of U.S. Trustee

By /s/ M.B. Thompson
       Judicial Assistant

---

[15]  FED. R. BANKR. P. 8001 allows for direct appeal to the Circuit in certain circumstances.  Due to the evolving state of the law concerning § 524(e), perhaps it is timely for the Circuit to take a fresh look at this issue.